UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>METROPOLITAN WATER RECLAMATION DISTRICT OF GREATER CHICAGO,<br><br>Defendant. | No. 11 C 02937<br><br>Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

As previously recounted, the plaintiffs, Natural Resources Defense Council, Inc., Sierra Club, Inc., and Prairie Rivers Network are non-profit environmental groups who have brought this case pursuant to the citizen-suit provision of the federal Clean Water Act. In Count Two, the plaintiffs claim that the Metropolitan Water Reclamation District of Greater Chicago ("MWRD" or "District") violated the terms of its National Pollution Discharge Elimination System ("NPDES") permits, and thus the Act itself, at three area water reclamation plants ("WRPs") that it operates. Specifically, the plaintiffs claim that the effluent from the WRPs contains levels of phosphorus that have caused conditions in the receiving waters that violate Illinois water quality standards with respect to levels of algal and plant growth and dissolved oxygen ("DO"). The plaintiffs maintain that the water quality standards are enforceable against the District because Special Condition 5 of the three NPDES permits for the WRPs incorporates those standards.

This Court has already ruled on both parties' motions for summary judgment, first rejecting the District's primary-jurisidction defense and also holding that the so-called "permit shield" did not protect it to the extent it was not in compliance with Special Condition 5, which

the court held incorporates the Illinois water quality standards as substantive terms of the permit, compliance with which is required in order for the permit shield to apply. The court held that the permit shield defense can apply only if the three WRPs' effluent does not cause violations of the Illinois WQS, and therefore the defendant's motion for summary judgment was denied. So too was the plaintiffs's motion. The court concluded that the plaintiffs failed to establish as a matter of law that the phosphorus content of the WRPs' effluent caused violations of the unnatural-growth and DO water quality standards, and that, accordingly, they did not establish any violations of Special Condition 5 of the NPDES permits and the Clean Water Act.

While summary judgment proceedings were pending, another of the plaintiffs' cases, which challenged the most recent permits granted to the District, made its way through the Illinois courts.[1] The plaintiffs lost in the admistrative appeal but won in the Illinois Appellate Court. In particular, the appellate court concluded that the permit terms merely incorporating the Illinois WQS were not enforceable as a practical matter and therefore placed no substantive restrictions on the District's phosphorus discharges. The new permits will require reconsideration by the ICPB in light of the ruling. So, the District now comes back to this Court to raise the argument that the plaintiffs are judicially estopped from arguing that the District violated permit terms that the plaintiffs successfully argued elsewhere could not meaningfully restrict phosphorus discharges.

---

[1] The plaintiffs here are among the group of petitioners who appealed to the Illinois Pollution Control Board the provisional 1.0 mg/L phosphorus limit in the 2013 permits. The Board granted summary judgment in favor of the District and the IEPA, upholding the phosphorus limitations as sufficient and finding no issue with the state agencies' procedures for developing and imposing it.. Recently, however, the Illinois Appellate Court reversed the IPCB, holding that there is a genuine issue of material fact regarding whether, to prevent unnatural plant or algal growth, the phosphorus limit should be lower than 1.0 mg/L and whether Special Condition 5 is a sufficient limitation. *See Prairie Rivers Network v. Illinois Pollution Control Bd.*, 2016 IL App (1st) 150971, ¶ 35.

**LITIGATION BACKGROUND**

Familiarity with the facts of this case is assumed, and they are not set forth again here. The litigation history, however, governs the resolution of this motion.

This case was filed in May 2011 (and assigned to two judges before this one). It sought enforcement of the District's 2002 NPDES permits as to the phosphorus content of effluent from three WRPs. Briefing on the parties' summary-judgment motions was completed in November 2014. In the meantime, the IEPA had issued renewed permits to the District, effective January 1, 2014 (the "2013 permits"). After the parties engaged in prolonged settlement negotiations, this Court ultimately denied both summary-judgment motions on March 31, 2016 (and amended its opinion slightly on April 20); both parties' motions were denied. Thereafter, the case was set for a bench trial on January 17, 2017.

Meanwhile, the plaintiffs, among others, appealed the 2013 permits to the Illinois Pollution Control Board. They argued that the permits, which newly imposed a numeric restriction on phosphorus levels of 1.0 mg/L on a monthly average, did not go far enough to limit phosphorus and that the new numerical standards were too high to ensure compliance with applicable water quality standards. The ICPB granted summary judgment for the District on December 18, 2014, upholding the 2013 permits. The plaintiffs appealed to the Illinois Appellate Court. *See Prairie Rivers Network, et al. v. Illnois Pollution Control Board*, Appeal No. 15-0971, 50 N.E.3d 680 (Ill. App. Ct. 2016) (Mot. Ex. A, ECF No. 165-3.) The plaintiffs-appellants filed their opening brief on June 7, 2015, the District responded on November 6, 2015, and the plaintiffs replied on November 20, 2015. On February 26, 2016, the appellate court ruled in favor of the plaintiffs and remanded the case to the IPCB for further proceedings on the 2013 permits. A month later, this Court ruled on the pending summary-judgment motions in this case,

which is directed at remedying alleged past and ongoing violations the 2002 permits. (Neither party suggests that it matters for purposes of this judicial-estoppel motion that the state court appeal addressed the 2013 permits, while this lawsuit pertains to the 2002 permits; Special Condition 5 appears, in identical form, in both.) Neither party supplemented its briefs based on the state appellate court's decision before this Court ruled.[2]

In the state appeal, the plaintiffs-appellants argued that in granting the District's 2013 NPDES permits, the IEPA violated the Clean Water Act's implementing regulations, and in particular, the water quality standards for offensive conditions, unnatural plant and algal growth, and the minimum dissolved oxygen standards, because the permits insufficiently restricted the amount of phosphorus in the effluent.[3] Appellants' Br. at 1. They contended that the numeric limitation was arbitrary, not supported by the scientific record, not designed to ensure that water quality standards would not be violated, and was imposed just because the District agreed to accept that limitation. Appellants' Br. at 19. The appellants requestion a remand to the IPCB to require IEPA to create "science based numeric phosphorus limits that comply with the law." *Id*. at 20. They argued that both Illinois and federal regulations require the development of numeric phosphorus limits to prevent phosphorus pollution, *id*. at 24, but also that NPDES must contain limitations that also prevent the violation of the various narrative standards---*i.e*., the narrative standards that are the subject of this lawsuit. They expressly argued that in developing an

---

[2] In that sense, the District's present motion could be ruled untimely; it knew before this Court even issued the summary-judgment ruling that the plaintiff had prevailed in state court and, in the District's view, was taking an inconsistent position in this Court. It waited seven months from the state court's decision to raise judicial estoppel.

[3] The plaintiffs-appellants' arguments can be found in their opening and reply briefs at Exhibits B and E to the District's motion, respectively; see Appellant's Brief, Ex. B, ECF No.165-4; Appellant's Reply, Ex. E, ECF No. 165-7. The District's brief as appellee is filed at Ex. C, ECF No. 165-5. The docket citations will not be further replicated, for ease of reading. The briefs will simply be referred to by name and page number.

4

numeric limitation,"[t]he applicable water quality standards are the offensive condition / unnatural growth standards and the dissolved oxygen standards." *Id*. at 27. The appellants agreed with IEPA that Special Condition 5 of the permits addresses phosphorus discharges and "at least affords citizens an opportunity to enforce violations . . . through citizen suits" (such as this one), but that relying on Special Condition 5 alone to not meet the federal requirement for "chemical-specific limits," and is insufficient to ensure compliance with the WQS. *Id*. at 27-28. The appellants further argued that the Special Condition, which essentially just directs compliance with the law, suffered problems beyond illegality:

> First, this approach turns what is required to be a forward-thinking permit limit designed to prevent violations of water quality standards into a "catch me if you can" enforcement issue. Further, the condition does not provide guidance as to what monitorying should be required or otherwise lend itself to efficient enforcement. Finally, it leaves up to the discharger to decide what is necessary to meet water quality standards until corrected through an enforcement action.

Id. at 28. The appellants' many other arguments challenging the procedure and substance of the permits did not pertain to the effect of Special Condition 5.

The District and its co-defendants countered that the permits were perfectly adequate and that the IEPA had fulfilled its obligations impose limitations to ensure compliance with water quality standards. The District argued that its concession to follow the 1.0 mg/L interim limitation---which techinically applies just to "new or explaning plants" went well beyond any legal obligations it has. Dist. Appellee Br. at 25. The District argued that "there is no basis under Illinois law for a more stringent phosphorus requirement in the " 2013 permits. *Id*. at 27. The District also faulted the appellants, as it has in this case, for trying to use litigation to "circumvent" Illinois' ongoing nutrient study and administrative process for "methodically developing science-based nutrient standards." Distr. Appellee Br. at 24. The IPCB, said the

5

District, "correctly determined that [IEPA] was reasonable in imposing the 1.0 mg/L interim phosphorus limit on the District in the Permits white the State works on developing a long-range, statewide standard for that nutrient." *Id*. at 28.

Regarding Special Condition 5 and the narrative water quality standards (which the District did *not* argue were inapplicable or unenforceable, as it does in this case), the District first argued that there was no correlation or causation between its phosphorus discharges and "upstream" algal growth or growth in far-away downstream lakes. The District next argued that the appellants relied on the wrong standards for D.O. content and that, again, there was no evidence of a "connection" between the D.O. levels in the waterways receiving the phosphorus from the District's effluent. *Id*. at 34. The District further argued that IEPA would have been within its rights not to impose any phosphorus limits at all, because phosphorus does not have, in the language of the Clean Water Act regulations, the "reasonable potential" to cause or contribute to violation of water-quality standards. *Id*. at 36. But, instead of stopping with the numeric standard, the IEPA "also included a 'special condition' *expressly mandating* that the District's effluent cannot cause or contribute to a water quality violation." *Id*. (emphasis added). Thus the District contended not only that phosphorus limitations, including the narrative water quality standards, were part of its permit, but that those limits went above and beyond what the law required the agencies to impose.

In reply, the appellees returned to the insufficiency of Special Condition 5 to comply with laws enforcing water quality standards, arguing that Special Condition 5 "is not a substitute for actually taking the steps necessary to ensure that the Permits *do*, in fact, ensure protection by setting concrete numberic discharge limits established through scientific analysis." Reply at 17 (emphasis in original). They cited the newly issued opinion in *NRDC v. U.S. EPA*, 808 F.3d 556

(2d Cir. 2015), which held that an analogous condition in an NPDES permit for ocean-going vessels, relying on narrative WQS, was "insufficient" to give shipowner guidance as to what is expected or tp allow any permitted authority to determin whether a shipowner is violating water quality standards." The appellants' argument appeared to be primarily a rebuttal to the District's and State agencies' arguments to the effect that Special Condition 5 ensures "that no discharge, whether by itself or in combination with any other substance, will cause a violation of applicable [WQS]" and that the appellants therefore "cannot maintain that phosphorus discharges will cause impairments to the receiving waters." State Appellee Brief 21, Ex.D, ECF No. 165-6. The State, therefore, like the District, took the position that the narrative water quality standards incorporated into Special Condition 5 impose substantive limitations.

The Illinois Appellate Court ruled in the plaintiffs' favor and remanded the case to the ICPB to reevaluate the phosphorus limits in the 2013 permits. The appellate court first described the 2013 permits' limits on "total phosphorus, including the numeric limit and "a 'special condition,' expressly mandating that the District's effluent cannot cause or contribute to water quality violations." *Prairie Rivers Network,* 50 N.E.3d at 683. Given the numerous federal and state standards for NPDES permits, the court concluded ultimately that "genuine issues of material fact exist as to whether the IEPA complied with the Act and the corresponding federal and Board regulations when issuing final permits for the Stickney, Calumet, and O'Brien plants." In particular, the Court noted the IEPA's obligation to convert narrative standards into chemical-specific limitations because of the difficulty with understanding and applying narrative standards to particular pollutants. *Id*. at 685. The Court also noted that although a numeric limit was established, "there is no evidence that such a limit was derived from any state or federal standards" and was in fact contrary to the developed record before the IPCB. *Id*. at 686-687. The

appellate court was also persuaded by the Second Circuit's NRDC decision, explaining: "Similarly, here, the special condition did not ensure compliance with water quality standards as it gave no guidance as to what was expected from the District, nor did it allow the IEPA to determine whether the District was violating water quality standards." *Id*. at 688. Special Condition 5, therefore, did not go far enough to ensure that water quality standards could be understood, followed, and enforced.

## DISCUSSION

The District's motion turns on the application of judicial estoppel. That equitable doctrine prevents a party who successfully litigates one position from later arguing the opposite position in another proceeding. *Adkins v. VIM Recycling, Inc*., 644 F.3d 483, 495 (7th Cir. 2011); *Jarrard v. CDI Telecommunications, Inc*., 408 F.3d 905, 914 (7th Cir. 2005) (explaining, "the doctrine aims to prevent a party that prevails in one lawsuit on one ground from repudiating that same ground in another lawsuit"); *United States v. Newell*, 239 F.3d 917, 921 (7th Cir. 2001) (for judicial estoppel to apply, prior inconsistent argument must have been accepted by the court in some manner). Judicial estoppel is "invoked at the court's discretion," but three general principles guide the inquiry: "(1) whether the party's later position was 'clearly inconsistent' with its earlier position; (2) whether the party against whom estoppel is asserted in a later proceeding has succeeded in persuading the court in the earlier proceeding; and (3) whether the party 'seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *In re Airadigm Communications, Inc.*, 616 F.3d 642, 661 (7th Cir. 2010) (citations omitted); *see In re Knight–Celotex, LLC*, 695 F.3d 714, 721-22 (7th Cir. 2012) (citing *New Hampshire v. Maine*, 532 U.S. 742 (2001)). "Additional considerations may inform the doctrine's application in specific factual contexts." *New*

*Hampshire*, 532 U.S. at 751. At bottom, a litigant is not entitled to assail the integrity of the judiciary by prevailing twice on opposite theories. *See Airadigm Communications*, 616 F.3d at 66; *In re Hovis*, 356 F.3d 820, 823 (7th Cir. 2004) ("One who argues a position in court, and prevails, rarely is entitled to switch ground and argue an inconsistent position later, even within the scope of a single proceeding.").

The doctrine of law of the case also comes into play here. This Court previously ruled that Special Condition 5 imposes a substantive limitation on the District's phosphorus discharges under its 2002 NPDES permits. The law of the case doctrine teaches that, unless it becomes evident that a ruling was clearly erroneous, a court's decision on a rule of law should continue to govern the same issue in the same case. *See Sharp Elecs. Corp. v. Metro. Life Ins. Co*., 578 F.3d 505, 510 (7th Cir. 2009) ("The doctrine reflects the idea that a single court should not revisit its earlier rulings unless there is a compelling reason to do so. It is designed to further consistency, to avoid constantly revisiting rulings, and to conserve judicial resources."); *Jarrard,* 408 F.3d at 911-912. The law of the case "blocks new theories as well as old ones" on a decided issue. *Peoples v. United States*, 403 F.3d 844, 846 (7th Cir. 2005). The parties did not move for reconsideration of the prior ruling in light of a change in precedent or some other intervening event, or because the court made some manifest error. Although it is entitled to revisit any interlocutory ruling "whicle there is still time to prevent error." *Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 739 (7th Cir. 2010), the court sees no reason to spontaneously reverse its prior decision on this point. Therefore the parties and the court are bound by the previous ruling that the Illinois WQS apply to the District by their incorporation into Special Condition 5 and that the narrative WQS impose a substantive limititation. That is rule that would govern at trial—if there is to be one.

So have the plaintiffs taken a position in federal court that is clearly inconsistent with the position they presented in state court on the issue of whether the Illinois WQS imposed substantive and enforceable limitations on phosphorus discharges by the District? The plaintiffs contend that the District has misconstrued its state-court arguments to make it appear so, but they say that they "never argued" in state court that the narrative standards incorporated into the NPDES permits through Special Condition 5 are "unenforceable," but only that they were difficult to enforce and should be replaced or augmented with numeric, chemical-specific standards for phosphorus. Resp. Br. 1, ECF No. 166. The defendant says this is double-speak. The District argues that the Illinois Appellate Court came to its decision only by accepting the plaintiffs' argument that the narrative critieria did not limit phosphorus discharges.

In what this court considers a fair summary, the plaintiffs argued in state court that Special Condition 5 is inadequate and insufficient to protect water quality standards, and therefore that the permit needed to be remanded to the IPCB to implement workable limits for phosphorus discharges. The plaintiffs did not argue that the Condition and the WQS were entirely unforceable or could not be applied, though they noted the difficulty of doing so and the inefficiency of ex post facto enforcement through litigation after violations occurred; in other words, the existing standards were insufficient. Indeed, they expressly noted that Special Condition 5 allowed "at least" some ability to create and enforce phosphorus limitations through citizen suits, but that Special Condition 5 was a "poor substitute" for a forward-looking limitation. The District's characterizations of the plaintiffs' state-court arguments, therefore, and especially the suggestion that the plaintiffs argued that the narrative criteria were unenforceable are inaccurate and without any grounding in the plaintiffs' words before the state appellate court. Therefore, there is no inconsistency, let alone a "clear" one, between the plaintiffs' arguments in

that court and their arguments here. There is simply nothing wrong with trying to enforce existing limits while pushing for the imposition of more and stringent regulations going forward.

It is not necessary to go further, but the court notes as well that the plaintiffs did not "prevail" in state court on the issue of the enforceability of Special Condition 5, first because they did not argue that it was unenforceable and second because the appellate court did not so hold. It simply agreed with the Second Circuit and the plaintiffs that the special condition did not relieve the IEPA of its oblibation to substantively, and proactively, address water quality standards with workable criteria in the permits themselves. Indeed, this Court's many readings of the *Prairie Rivers Network* opinion leave it baffled as to how the District can argue that "there can be no doubt that Plaintiffs succeeded with their argument to th appellate court to reverse IPCB's approval of the District's permits on the ground that Special Condition 5 was *unenforceable*." Dist. Br. 10, ECF No. 165-1 (emphasis added). Not only was nothing said about enforceability (other than the inherent difficulty), but the appellate court had many grounds for its decision that the responsible agenicies had wholly failed to follow applicable regulations in issuing the 2013 permits.

Finally, as an equitable matter, this court would not apply judicial estoppel here because the plaintiffs are not the only ones who have flirted with inconsistency. In its summary judgment opinion, this court noted its surprise about the District's arguments as summarized by the Illinois Appellate Court, as they diverged from the ones presented here. See Am Op. & Order16 n.5, ECF No. 156. The District argued in state court that Special Condition 5 "mandate[s] that the effluent cannot contribution to WQS violations." Here, on summary judgment, it contended that Special Condition 5 had no effect because its phosphorus discharges were disclosed before the permit issued and that the narrative standards did not impose effluent limits on phosphorus. The

tension between these arguments, if not a "clear" inconsistency, is at least as pronounced as that afflicting the plaintiffs' arguments about the enforceability of Special Condition 5. Accordingly, barring the plaintiffs' argument here would be inequitable, although of course as a formal matter the District's loss in state court precludes the application of judicial estoppel against it. Nevertheless, he who comes to equity must come with clean hands. *Gutierrez v. Gonzales*, 458 F.3d 688, 693 (7th Cir. 2006) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, (1945)). This is not to denigrate the District or suggest any wrongful action; the "unclean hands" doctrine is not at issue, but a similar principle of fair play is. In the Court's view, both parties have strategically emphasized different points in different contexts, but the line of clear inconsistency has not been crossed, especially not by the plaintiffs, and it would not be fair to hold this sort of tactic—some might say "strategery"[4]—against only one side. Moreover, the court has already adverted to the lateness of this motion, which was filed only as the parties are gearing up for trial in earnest. It would cause substantial prejudice to toss out this case based upon a legal argument that was available to the District seven months before this motion was made.

The criteria for judicial estoppel do not apply. The defendant's motion is denied.

Date: December 27, 2016

John J. Tharp, Jr.
United States District Judge

---

[4] *See, e.g.,* Dan Simon, "5 Differences Between Strategy and Strategery," Forbes.com Sep. 11, 2012 @ 11:55 a.m., available at http://www.forbes.com/sites/dansimon/2012/09/11/5-differences-between-strategy-and-strategery/#16ab74822af8 (last visited 12/27/2016) (defining "strategery" as "a flimsy veneer of forethought [placed] over a largely reactive and often ineffective game-plan").